

SHYAM DAS, ARBITRATOR

| | |
|---|---|
| In the Matter of Arbitration Between | ) ) ARBITRATOR'S OPINION ) AND AWARD |

In the Matter of Arbitration    )    ARBITRATOR'S OPINION
Between                         )         AND AWARD
                                )
                                )
                                )
THE NATIONAL FOOTBALL LEAGUE    )
MANAGEMENT COUNCIL              )    Case Heard:
and THE TAMPA BAY BUCCANEERS    )      February 16, 2005
                                )
                                )
         and                    )
                                )
                                )
THE NATIONAL FOOTBALL LEAGUE    )    Award Issued:
PLAYERS ASSOCIATION             )      September 30, 2005
On Behalf of KEENAN McCARDELL   )


### Appearances


For the NFL Management Council:

                    Lisa F. Lazarus, Esq.
                    T. David Gardi, Esq.
                    Daniel L. Nash, Esq.
                    David G. Socie, Esq.


For the NFL Players Association:

                    Richard A. Berthelsen, Esq.

Dockets.Justia.com

**BACKGROUND**     Buccaneers/McCardell

In this grievance, filed on August 2, 2004, the Tampa Bay Buccaneers seeks return of $1,500,000 in bonuses paid to Keenan McCardell.

In June 2002, when he was an unrestricted free agent, McCardell signed a four-year contract with the Buccaneers. This contract included a signing bonus in the total amount of $2,000,000, which was paid in installments between June 2002 and January 2003. His contract provided:

> As additional consideration for Player's execution of NFL Player Contract for the years 2002, 2003, 2004 and 2005 for Player's reporting, practicing and playing with Club during all years of said contract without unexcused interruption or suspension, and for Player's adherence to all provisions of said contract during its term, Club agrees to pay Player the sum of Two Million Dollars ($2,000,000),....
>
>     \*        \*        \*
>
> In the event Player, in any of the years specified above, for any reason whatsoever, fails or refuses to report to Club without its consent or fails or refuses to practice or play with Club (except by reason of injury or death arising from conduct not in breach of Player's NFL Player Contract with Club), leaves Club without its consent, is suspended by the NFL or Club for Conduct Detrimental or is suspended for violation of the NFL Policy and Program for Drugs of Abuse and Alcohol, then upon demand by Club, Player shall be in default.
>
> In the event Player is in default, only a prorated portion of said bonus shall be

2                    Buccaneers/McCardell

> deemed to have been earned by Player, and
> then upon demand by Club, Player shall
> return to Club the proportionate amount of
> the total bonus not having been earned at
> the time of Player's default and Player
> shall forfeit any payments not as yet made.
>
> It is further understood and agreed that
> Player's obligation to repay any portion of
> said bonus provided herein is an express
> provision of this contract and, but for this
> provision, Club would not have executed this
> contract....
>
> (Emphasis in original.)

McCardell also was paid a $500,000 roster bonus in March 2004,
pursuant to the following provision in his contract:

> Player shall receive a bonus of Five Hundred
> Thousand Dollars ($500,000.00) should player
> be on Club's active roster on the first day
> of the 2004 League Year.  Such bonus will be
> paid as follows:
>
> $500,000.00 within ten (10) business days of
> the first day of the 2004 League Year.

In February 2004, the Buccaneers raised the
possibility of restructuring McCardell's contract to assist the
Club in complying with the salary cap.  The Club made it clear
that any new agreement had to be within the limits of the total
compensation McCardell was due to receive in 2004 under his
existing contract.  Through his agents, McCardell made it clear
that he believed he deserved a considerable increase in

compensation based on his worth to the Club.[1]  No deal was
reached.

Prior to the Club's mandatory minicamp in June 2004,
McCardell indicated he would not show up for minicamp if his
contract was not satisfactorily renegotiated.  The Club made it
clear that a failure to attend could result in the Club seeking
a return of a portion of his signing bonus.

McCardell did not attend the Club's minicamp.  The
Buccaneers then notified McCardell that his failure to attend
the minicamp constituted a breach of his contract, and demanded
he return $1,000,000 of his signing bonus.  McCardell did not
respond to the Club's letter.

McCardell also failed to report to the Buccaneers'
mandatory training camp which opened on July 30, 2004.  His
agents informed the Club that he had no intention of showing up
unless his contract was satisfactorily renegotiated to provide
him greater pay.  The Club responded by filing this grievance on
August 2, seeking repayment of $1,000,000 of his $2,000,000
signing bonus and repayment of the $500,000 roster bonus he
received earlier in 2004.

---

[1] McCardell asserts that his bargaining power was reduced when he
signed the contract with Tampa Bay because he was released from
his prior contract as a "June 1 cut".  He also points out that
he was a significant factor in the Buccaneers' 2002 season, when
the team won the Super Bowl, and had a very strong year in 2003
when he was the team's only Pro Bowl offensive player.

4                              Buccaneers/McCardell

McCardell persisted in his holdout through the first
six regular season games of the 2004 season, seeking more money,
an immediate release or the ability to seek a trade. Finally,
on the eve of the October 27, 2004 trading deadline, the
Buccaneers traded McCardell to the San Diego Chargers in October
2004 in exchange for two (or possibly three) draft picks. Under
the terms of the trade agreement, the Buccaneers assigned "all
of its rights, title and interest in" McCardell and his 2002
player contract. The Buccaneers' General Manager, Bruce Allen,
testified that he would not have made the trade if doing so
meant that he also traded the Club's right to pursue this
grievance.

### CLUB POSITION

The Buccaneers argue that McCardell must return one-
half of the signing bonus paid under his contract.
Enforceability of signing bonus agreements containing similar
conditions as those in McCardell's contract is well established
under the Collective Bargaining Agreement (CBA) and NFL
arbitration precedent.

There is no dispute that McCardell breached the
conditions contained in his signing bonus clause. After playing
only two years under the four-year agreement, he completely
repudiated the contract and never reported, practiced or played
with the Buccaneers again. The contract is explicit that this
breach was material and specifically requires him to return
$1,000,000 of the signing bonus.

Contrary to McCardell's assertion, the contract is not ambiguous. Quite clearly, the "time of default" here was the very beginning of the 2004 season, when McCardell adamantly refused to perform any services for the Buccaneers ever again in the two years remaining under his contract. Former General Manager Idzik testified that in negotiating this contract, he understood that repayment of the signing bonus in the event of an intentional breach by McCardell certainly was not limited to only the amount attributable to the regular season games missed by McCardell, but rather was designed to require the player to return the portion of the bonus which was unearned at the time the breach occurred. Idzik also testified that he communicated his understanding to McCardell's agents during the negotiations.

The Club points out that McCardell's "games missed" interpretation also completely ignores that the player's contractual obligations are not limited to just the actual playing in the Club's regular season games, but include attendance at minicamp, training camp and post season games.

The Club also maintains that NFL arbitration precedent, in particular <u>Miami Dolphins v. Williams</u> (Bloch 2004), <u>Denver Broncos v. Kennison</u> (Wittenberg 2003) and <u>Stevens v. Seattle Seahawks</u> (Kagel 2004), support its position on the proper interpretation of McCardell's contract.

The Buccaneers seek return of the entire $500,000 roster bonus as restitution -- and not a forfeiture -- for

McCardell's several and material contract breaches.  The purpose
of restitution is to restore the injured party to the position
it occupied prior to entering the contract.  The amount of
recovery is the amount that the defendant has been unjustly
enriched.  Under virtually identical circumstances these well
established contract principles were applied in <u>Carolina
Panthers v. Greene</u> (Kagel 1997), in which Arbitrator Kagel found
the player breached his contract by failing to perform any of
the services he was obligated to perform under his contract.
Citing the testimony of General Manager Allen, the Club argues
in its brief:

> If anything, McCardell's deliberate holdout
> was even more egregious than in *Greene*.  The
> "giant cloud" of McCardell's holdout was a
> tremendous distraction from the Club's
> efforts to win football games.  The Club had
> to "scramble for players" in McCardell's
> absence, but was handcuffed in its ability
> to do so because McCardell's salary counted
> against its salary cap despite the fact he
> was not performing.  Tr. at 110-111 (Allen).
> Moreover, from the first day of McCardell's
> holdout during the mandatory minicamp until
> the day the Buccaneers traded him, McCardell
> and his representatives waged through the
> media their self-described "negotiating war"
> against the Club.  Allen testified that
> their relentless media criticism of the
> Buccaneers was a "constant pounding" on the
> Club.  *Id.* at 117.  Furthermore, the absence
> of its lone Pro Bowl offensive player, a
> "key component" to the Buccaneers, caused
> the Club's offense to struggle mightily,
> resulting in only one win in the Club's
> first six games.  *See id.* at 107 (calling
> McCardell a "key component" to the Club).

The Club insists that it is clear that McCardell would never again have performed for the Buccaneers under his contract. The fact that he ultimately performed under the contract after he forced the trade to the Chargers does not negate the Buccaneers' right to restitution. To accept his argument would send a clear and unequivocal message to each NFL player that he will ultimately profit from his contractual breach if he similarly poisons his employment relationship and forces his current club to either terminate his contract, thereby granting him unrestricted free agency and the ability to obtain a more lucrative contract, or to trade him to another Club that will accede to his contractual demands, as the Chargers have with McCardell.

The Club also rejects McCardell's attempt to distinguish this case from Greene on the basis that the Club received "valuable consideration" for him in the form of two draft picks. General Manager Allen testified that he never wanted to trade McCardell, and that the consideration was inadequate and far below market value for a Pro Bowl receiver. In any event, the Club asserts, the adequacy of the consideration the Club received from the Chargers is irrelevant to its entitlement to the return of the entire roster bonus as restitution for McCardell's repudiation of his contract. Moreover, it would be unjust to penalize the Club for seeking to make the best of a bad situation by obtaining what it could, however inadequate, in exchange for McCardell.

The Club insists it has standing to seek return of the bonuses.  Article IX of the CBA expressly provides that "[a] player need not be under contract to a Club at the time a grievance relating to him arises or at the time such grievance is initiated or processed".  The Club did not have to expressly reserve its right to pursue this grievance when it assigned McCardell's contract to the Chargers because its right to do so already was expressly reserved in the CBA.  It is not uncommon for players to pursue grievances against Clubs by whom they no longer are employed.  Williams, far from supporting McCardell's position, makes clear that a Club may enforce its contract rights based on a player breach that occurs while the player is employed by the club.

Finally, the Club contends that its enforcement of its rights under McCardell's contract in no way violates Florida law.  Both Williams and New Orleans Saints v. Craver (Kagel 2004) rejected similar arguments that bonus repayment provisions violated state law regarding liquidated damages.  Those decisions recognized that the Club's claim in these sort of cases is not for liquidated damages, but rather for the return of bonus payments the player is not entitled to retain because he failed to satisfy the terms of his contract.  There is no requirement in the CBA that the amount of a bonus to be repaid be proportionate to the player's breach.

The Club adds that even if Florida's law on liquidated damages applied here, which it does not, the standard under that

law is whether the amount of liquidated damages is out of all proportion to the reasonably anticipated loss for nonperformance.  The evidence in this case demonstrates that the amount sought by the Buccaneers in this grievance cannot possibly be found to be "out of all proportion" to the damages incurred by the Club as a result of McCardell's holdout.

## PLAYER POSITION

McCardell and the Players Association initially argue that the Club forfeited any right to pursue this grievance by executing the October 2004 trade agreement assigning "all rights, title and interest" in his contract to the Chargers. Under basic contract principles and Florida law -- which governs McCardell's contract with the Buccaneers -- the Club lacks standing to pursue an alleged breach of contract claim after its full and unconditional assignment of all rights in his contract. This includes the right to pursue claims for breaches of that contract that allegedly arose prior to that assignment.

McCardell stresses that this is exactly the position which the NFL Management Council successfully argued for in the recent Williams arbitration.  In that case, the Miami Dolphins sought reimbursement for a portion of the signing bonus paid to Ricky Williams by the New Orleans Saints before the Saints traded Williams to the Dolphins.  The Management Council argued that the rights and obligations assigned to the Dolphins included the right to pursue a grievance against Williams for breach of contract, and pointed out that the Dolphins "paid" for

the right to enforce the contract through the draft picks it
assigned to the Saints as part of the trade.  Arbitrator Bloch
agreed, finding that:  "[T]he Miami Dolphins, by standard
operation of the trade, now stand in the shoes of the assignor
New Orleans Club."  In this case, the Buccaneers could have
conditioned the trade upon retaining the right to pursue their
grievance against McCardell, but did not do so.

       It makes no difference, McCardell argues, that the
Buccaneers, as opposed to the Chargers, were the Club allegedly
aggrieved.  The Buccaneers still lack standing, both under basic
contract law and for purposes of Article IX of the CBA.

       Even if the Buccaneers have standing, McCardell
contends that the forfeiture language in his signing bonus
addendum is vague and ambiguous, and must therefore be
interpreted against the Club, under both NFL arbitration
precedent and Florida law.  The contract provides that in the
event the Player is in default:  "Player shall return to the
Club the proportionate amount of the total bonus not having been
earned at the time of the Player's default...."  Although
McCardell ultimately accepted this language at the Club's
insistence, his agent, Gary Uberstine, objected to then General
Manager John Idzik that it was "too ambiguous".  Moreover,
Uberstine testified without contradiction that Idzik "... tried
to sell me on the fact that it was better for Keenan to leave it
as proposed because it was ambiguous, and it could mean
anything, and no one interpretation was more plausible or
reasonable than another...."  McCardell contends that the words

"at the time of Player's default" need not be read as referring to a discrete point in time. Just as plausible would be an interpretation which contemplates the duration of his alleged default, and the end point of that default, in determining the prorated portion of the signing bonus which would be earned or forfeited.[2]

As McCardell interprets the contract, he was only "in default" for the period from the beginning of minicamp in June 2004 through the trading deadline on October 17, 2004. Measured in actual games missed, this period represents only six/sixty-fourths of his entire four-season contract (9.4%), and measured as months missed, it represents four/forty-eights of his 48-month contract (8.3%). Hence, the "prorated portion of said signing bonus" could be no more than $188,000 (9.4% of $2,000,000).

McCardell insists that prior NFL arbitration decisions dealing with forfeiture issues are not controlling here. The decision in Kennison, which is the only case involving similar forfeiture language, actually supports McCardell's position on proportionality. And Craver, the only other case involving a player who returned to play under his contract, as McCardell did here, has no value as precedent.

---

[2] McCardell also argues that the Club's position that the language is not ambiguous is discredited by subsequent changes the Club made in its standard forfeiture language, which now is considerably more specific.

McCardell maintains that there is no valid basis for
the Club's claim for repayment of his 2004 roster bonus.
McCardell satisfied the only condition specified in his contract
for receipt of this bonus by being on the Club's active roster
at the start of the 2004 season.  The CBA and NFL arbitration
decisions make clear that only written conditions recited in a
contract are to be enforced.  The decision in <u>Greene</u>, cited by
the Club in support of its claim that it is entitled to
repayment of this signing bonus as restitution for McCardell's
breach of contract, does not support the Buccaneers' position.
The facts in that case were different in that Greene's contract
had no signing bonus, and, therefore, unlike McCardell's
contract, it did not have a negotiated, liquidated damages
provision which fully addressed the issue of possible damages
for contract breaches.  Moreover, unlike Greene, McCardell did
not "repudiate" his contract and/or totally fail to perform
during the contract year in question.  McCardell instead played
in ten of the 16 regular 2004 season games pursuant to that
contract, and the Buccaneers -- unlike the Panthers in Greene's
case -- received valuable consideration for those services in
the form of draft picks from the Chargers.

Finally, McCardell argues that even if his contract
entitled the Club to recover $1,000,000 in signing bonus money
and/or the $500,000 roster bonus, Florida law on liquidated
damages would not permit enforcement of those penalties because
they are vastly disproportionate to any damages suffered by the
Buccaneers.  Indeed, the Buccaneers have established no evidence

of any estimated declines in revenue or any other measure of damages whatsoever.

McCardell asserts that under Florida law a contract provision designed to recover a penalty for "work actually performed" is unenforceable.  In this case, McCardell was "performing" under his contract for 42 of the first 48 games, and it appears he will "perform" for the final 16 games. Florida law does not permit him to be penalized for anything more than his six-game holdout (9.4% of his total contract). Therefore, at most, the damages awarded to the Buccaneers must be limited to 9.4% of his signing bonus and/or roster bonus.

McCardell insists that the Williams decision is not a basis for not applying Florida law in this case.  First, Williams did apply Florida's liquidated damages law; Arbitrator Bloch just did not find that the contractual provisions at issue violated that law.  Moreover, in upholding the Williams decision, a U.S. District Court recognized that Florida liquidated damages law applied, and that Williams' contention that the forfeiture of a portion of his signing bonus violated Florida public policy was meritorious, although the Court did not go so far as to vacate the award.  Miami Dolphins Ltd. v. Ricky Williams, 356 F. Supp. 2d 1301 (S.D. Fla. 2005).  In this case, the penalties sought by the Buccaneers are far more disproportionate than in Williams, and likely would have failed Arbitrator Bloch's analysis, and even the District Court's limited review in Williams.

14                     Buccaneers/McCardell


## FINDINGS

### Standing

McCardell's contention that the Buccaneers lack standing to pursue this grievance, which was filed before he was traded to the Chargers, is not persuasive.

In the first place, it is contrary to the position the NFLPA took in Williams, where it argued (as quoted at p. 6 of the decision):

> In short, while a player who is traded from one Club to another assumes the contractual obligation to perform future services for the new Club, and the acquiring Club assumes the contractual obligations to pay for those future services, there is no rule in the CBA or otherwise that results in the acquiring Club assuming all financial obligations of the original Club or the player assuming obligations to the new Club that relate to payments received from the original Club.

In Williams, the Player argued that the assignment of his contract by New Orleans to Miami did not include assignment of the right to enforce the forfeiture provision in his signing bonus clause. In that case, the Player had not defaulted on his contract until after its assignment to Miami. Arbitrator Bloch stated:

> While there may be specific elements of a
> predecessor contract that, for one reason or
> another, will not "travel", there can be no
> real question that, generally speaking, the
> essence of the respective obligations will
> continue until mutually agreed otherwise.

                    (Footnote omitted.)

Arbitrator Bloch also pointed out that Williams and the Dolphins
had explicitly indicated their joint intention to abide by the
signing bonus provisions at issue.

        As noted, <u>Williams</u> was quite different from this case
in that the Player had not defaulted prior to his trade, and, as
the Management Council pointed out in that case, the Dolphins
"paid" for the right to enforce the contract through the draft
picks it assigned to the Saints when the trade to Miami
occurred.  In this case, the Chargers also assigned draft picks
to the Buccaneers to obtain rights to McCardell's contract, but
it would be unrealistic to conclude the Chargers paid anything
for the right to pursue or "own" this pending grievance filed by
the Buccaneers for repayment of $1,500,000 in bonuses paid to
McCardell before he defaulted.  At the time of the assignment,
McCardell had been holding out and refusing to perform under his
contract for months.  The Chargers clearly would not have
purchased McCardell's contract unless they had reached agreement
on the terms on which he would play for the Chargers after the
trade.  Those terms were more favorable to McCardell than those
in the assigned Buccaneers' contract -- which McCardell had
refused to play under -- and undoubtedly did not contemplate the

16                          Buccaneers/McCardell

Chargers assuming or exercising the right to press this
grievance to its conclusion.

This grievance properly was initiated by the
Buccaneers under Article IX of the CBA following McCardell's
default and breach of his contract. Moreover, Section 1 of
Article IX states that any dispute "involving the interpretation
of, application of, or compliance with ... the NFL Player
Contract ... will be resolved exclusively in accordance with the
procedure set forth in this Article...." Article IX also
provides that: "A player need not be under contract to a Club
at the time a grievance relating to him arises or at the time
such grievance is initiated or processed." This case differs
from Williams in that the Buccaneers, not the Chargers, is the
Club with a stake or interest in this grievance involving a
player contract.

At issue is the Club's right to pursue a grievance
under the CBA with respect to a Player contract entered into
pursuant to the CBA. In light of the provisions of Article IX
and the circumstances under which McCardell's player contract
was assigned to the Chargers, I am not persuaded that Florida
law, if applicable to the issue of standing in this collective
bargaining context, would preclude the Buccaneers from
continuing to pursue this grievance after McCardell was traded
to the Chargers. The respective rights of the assignee and
assignor of a Player contract must be determined in the context
of the CBA and the particular facts involved.

## Signing Bonus

While the forfeiture language in McCardell's signing bonus clause could have been more explicit, I do not find it to be ambiguous. It provides:

> In the event Player is in default, only a prorated portion of said bonus shall be deemed to have been earned by Player, and then upon demand by Club, Player shall return to Club the proportionate amount of the total bonus not having been earned at the time of Player's default and Player shall forfeit any payments not as yet made.

In this case, McCardell was in default when he failed to show up for minicamp. There is no need to consider whether he would have been in default if he was 15 minutes late or if his failure to report was due to circumstances beyond his control or was inadvertent. McCardell intentionally refused to report, practice or play for the Buccaneers, as required under his contract, over the course of several months before the Club was forced to trade him to salvage anything from its ownership of that contract. He refused to perform during the entire pre-season and the first six games of the regular season up to the trading deadline. He conveyed to the Club in no uncertain terms that he would not perform for Tampa Bay under his contract if his compensation for 2004 (and presumably 2005) was not renegotiated. While the Club at first may have thought it likely he would back down, that never occurred and there is no reason to assume it ever would. That was why the Buccaneers,

who regarded him as one of their most valuable Players, finally
decided to trade him on the eve of the trading deadline.

Once he was in default, McCardell was obliged "to
return to Club the proportionate amount of the total bonus not
having been earned at the time of Player's default". The
contract does not state "during" the Player's default. It
states "at the time of" the Player's default. It also provides
that "Player shall forfeit any payments not as yet made". While
that language is not directly relevant, it supports an
interpretation that "at the time ... of default" refers to a
discrete point in time not a period with a beginning and end.

The Kennison case involved similar default language.
The Arbitrator found that language to be "clear on its face".
The Player's argument in that case that he only missed one game,
before the Club terminated his contract, was rejected by
Arbitrator Wittenberg, who stated (at p. 20):

> The default language clearly requires the
> return of the proportionate amount not
> earned at the time of default. At the time
> Kennison breached his contract, he did more
> than miss one game. He deprived the Club of
> the benefit of his services for the second
> half of the first season and seasons two and
> three in their entirety. The Player is
> required to repay the Club for the period of
> time he made himself unavailable pursuant to
> the performance requirements of his
> contract; to refund the proportionate share
> of the Bonus that he did not earn by virtue
> of his breach.
>                     (Emphasis added.)

In Kennison, the Player said he was retiring. The following day
he sought to rescind his retirement. Two weeks after his
contract was terminated, he signed a six-year contract with
another Club. In this case, McCardell told the Club he would
not perform under his existing contract, and he persisted in his
holdout for months. He only resumed performance after he was
traded to the Chargers, who met his demand for additional
compensation. It is no more realistic to find that McCardell
only missed six games, for purposes of applying the forfeiture
provision in his signing bonus clause, than it would have been
to find that Kennison only missed one game. McCardell deprived
the Buccaneers of the benefit of their bargain -- that he would
play for the Club under the agreed terms -- not just for a
limited time period, but for the remainder of his contract.
This conclusion is not changed by the fact that the Buccaneers
were able to obtain some compensation for assigning his contract
to the Chargers. His receipt of the $2,000,000 bonus for
signing a four-year contract was subject, in the event of a
default such as occurred here, to an obligation to repay the
portion not earned when the default occurred.

Under the terms of his contract, when McCardell
defaulted on his contract he forfeited his right to retain the
$1,000,000 of his signing bonus that he had not yet earned by
performing under his contract.

## Florida Law on Liquidated Damages

This issue was squarely raised and decided in
<u>Williams</u>.  Arbitrator Bloch stated (at pp. 10-11):

> The various state law cases do reflect the
> commonly-accepted principle that a
> liquidated contract provision must bear some
> reasonable relationship to the anticipated
> loss.  On its face, the forfeitures here at
> issue are substantial.  So, however, are the
> tradeoffs by the Club in gaining the
> Williams contract--two first round and a
> fourth round draft choices.  Even were one
> to embrace a liquidated damage approach, it
> is not at all clear the stakes would be
> considered disproportionate.  <u>But the
> clauses in these agreements are not
> liquidated damage provisions; they are,
> instead terms that highlight, with
> precision, those circumstances in which
> bonus monies will be given and those in
> which they will be taken away.</u>

(Emphasis added.)

Arbitrator Bloch went on to explain (at pp. 11-12) why the
forfeiture clauses included in NFL signing bonus provisions such
as the one in <u>Williams</u> are <u>not</u> liquidated damage provisions:

> Reading the contract as a whole, there is no
> real question that what was bargained here
> was a comprehensive incentive and default
> mechanism.  At stake was not solely a series
> of individual field performance goals and
> rewards for the player but also a long-term
> arrangement that figured prominently in the
> Club's overall plan.  Under the

circumstances, it was not unreasonable for
the parties to structure incentives that
recognized and accommodated both
expectations.  These were not simply
surrogate methods of estimating damages in
the event the bargain went sour; rather,
they were the essence of the bargain
themselves.

Failing to honor and enforce the clear terms
of this particular arrangement would be to
at once ignore both the overlay of the
master collective bargaining agreement and
the overall structure of this individual
Player Contract.  (Footnote omitted.)

The conclusions reached by Arbitrator Bloch are
equally applicable in this case.

McCardell cites the U.S. District Court's decision in
Williams, which upheld Arbitrator Bloch's award.  In that
decision, the Court said:  "The public policy argument of
Williams has some merit."  The Court went on, however, to state
(at pp. 1305-6):

However, the Court finds that the arbitrator
in this case was well within the scope of
his authority in interpreting the default
provisions of the contract in the context of
the NFL's CBA and Florida law.  The fact
that the arbitrator construed the contract
in a manner that avoided consideration of
whether the actual damages were proportional
to the default provisions does not render
his decision in manifest disregard or
against the public policy of Florida.

                    (Footnotes omitted.)

As the Court stated (at fn 4), Arbitrator Bloch "concluded that
the default provisions were not penalty provisions...." I
similarly find that the forfeiture provision in this case is not
a penalty or a liquidated damage provision.

Roster Bonus

        As McCardell stresses, the roster bonus clause in his
contract contains no conditions other than that he be on the
Club's active roster on the first day of the 2004 League Year.
McCardell satisfied that condition and was paid the bonus.
Thereafter, however, he materially breached his contract by
failing to report to minicamp or training camp and persisting in
his holdout until the eve of the trading deadline when the Club
traded him to the Chargers because there was no prospect that he
would perform for the Buccaneers as required by his contract.

        Greene involved a similar type of roster bonus. In
that case there was a two-year contract, covering the 1996 and
1997 seasons, with a $350,000 roster bonus payable on February
27, 1997. Greene breached his contract by refusing to report to
minicamp or training camp, and the Club terminated his contract
on August 24, 1997. Arbitrator Kagel found that Greene's roster
bonus was not "an independent standing contract" but part of his
overall Player's Contract, and that Greene breached his 1997
contract and caused damage to the Club before his termination.
On that basis Arbitrator Kagel held the Club was entitled to
restitution of the $350,000 paid to Greene.

McCardell argues that, unlike _Greene_, his contract had a signing bonus which included a negotiated liquidated damages provision which fully addressed the issue of possible damages for contract breaches. But, as already discussed, the forfeiture provision in his signing bonus clause is not a liquidated damages provision. Rather, it sets forth the conditions under which the portion of that signing bonus unearned at the time of default is to be returned to the Club if the Player defaults.

McCardell also seeks to distinguish _Greene_ on the basis that McCardell did not "repudiate" his contract and/or totally fail to perform during the 2004 season. This latter argument is based on the games McCardell played after he was traded to the Chargers. McCardell also stresses that the Buccaneers received valuable consideration for the services he performed after the trade in the form of draft picks from the Chargers.

Restitution is an equitable remedy designed to restore the injured party to the position it occupied before entering the contract. In this case the issue is whether McCardell was unjustly enriched by receiving the roster bonus and then breaching his contract. Although the Buccaneers did receive some compensation when they assigned his contract to the Chargers, it clearly was not equal to the value of McCardell performing his contract and playing for the Buccaneers for the remainder of his four-year deal. By continuing to hold out up

to the trading deadline, it seems safe to conclude, McCardell's
action in breach of his contract, reduced Tampa Bay's bargaining
position in trading his contract.  Moreover, as General Manager
Allen testified, McCardell's holdout was significantly
detrimental to the Buccaneers' performance as a team both in the
pre-season and during the first six games of the regular season
prior to his trade.  Harm to the Club is not measured solely in
terms of revenue, as the evidence cited to show damage to the
Club in <u>Greene</u> reflects.

McCardell's roster bonus clause, unlike some others,
does not spell out any conditions subsequent or forfeiture terms
under which the bonus is to be returned.  As <u>Greene</u> recognizes,
however, it is part of his overall Player contract.  Where, as
here, the Player after receiving the roster bonus refuses to
perform at all for the Club under his contract, and this results
in significant damage to the Club, repayment of the roster bonus
as restitution for McCardell's breach of contract is
appropriate.

## AWARD

The Club's grievance is granted.  Keenan McCardell
shall forthwith repay the Tampa Bay Buccaneers the total sum of
$1,500,000.

<u>Shyam Das, Arbitrator</u>

24                    Buccaneers/McCardell

to the trading deadline, it seems safe to conclude, McCardell's action in breach of his contract, reduced Tampa Bay's bargaining position in trading his contract. Moreover, as General Manager Allen testified, McCardell's holdout was significantly detrimental to the Buccaneers' performance as a team both in the pre-season and during the first six games of the regular season prior to his trade. Harm to the Club is not measured solely in terms of revenue, as the evidence cited to show damage to the Club in <u>Greene</u> reflects.

McCardell's roster bonus clause, unlike some others, does not spell out any conditions subsequent or forfeiture terms under which the bonus is to be returned. As <u>Greene</u> recognizes, however, it is part of his overall Player contract. Where, as here, the Player after receiving the roster bonus refuses to perform at all for the Club under his contract, and this results in significant damage to the Club, repayment of the roster bonus as restitution for McCardell's breach of contract is appropriate.

<u>AWARD</u>

The Club's grievance is granted. Keenan McCardell shall forthwith repay the Tampa Bay Buccaneers the total sum of $1,500,000.

Shyam Das, Arbitrator